Good morning, Your Honors. Lou Diaz appearing on behalf of the G.W. Palmer Appellants. Your Honors, I'd like to reserve four minutes for rebuttal. Watch the clock. Remember, it counts down. May it please the Court. The issue in this case, as framed by the District Court opinion, is whether this circuit in Boulder Fruit held that any commercially reasonable financing arrangement? Well, that's not the exact language of Boulder Fruit, is it? The exact language... Boulder Fruit says, Judge Silverman, I've re-read it several times, he talks about commercially reasonable sale. That is correct, Your Honor. And so, one question in my mind, and I think the central question for me in this case is, putting aside whether this arrangement is a sale or something else, have we adopted a commercially reasonable sale doctrine or a commercially reasonable commercial arrangement doctrine? In reviewing the Boulder Fruit opinion, the District Court misapprehended that opinion. I believe the Boulder Fruit case is limited to commercial reasonable sales of accounts receivable. That is the standard. The commercially reasonable standard is limited just to sales. Why is that? It's limited to sales because under PACA, PACA applies specifically to secured lenders. Section 5c1 of the PACA says, explains the intent and the purpose of the PACA, and it really framed the issue before the court. That provision provides financing arrangements that encumber or give a security interest in produce and any receivables or proceeds from the sale of produce are contrary to the public interest. It's dealing with security interests, not a sale. So, in your view, does the statute prohibit security interests that are subordinated to the growers' interests? It does not prohibit the granting of a security interest. However... Contrary to the public interest sounds like void language to me. It does, Your Honor, it does. Basically, it forbids a security interest in encumbering trust assets to the extent, such assets are unavailable to pay the produce suppliers and are freely available at all times to pay the produce suppliers. That's the only time it's forbidden. So, just so I understand, you agree, do you not, that if it's a security agreement, the secured lender is subordinate to the sellers under the... That is correct. Under the statute. If it's a sale, and assuming it's a commercially reasonable sale of accounts receivable, that's fine, and the buyer takes them free and clear of liens? That is correct. Okay. So, as a matter of securities law, UCC law, how does one sell an asset that has a lien against it free and clear of all liens? Well... What Boulder Fruit seems to say can be done, tell me how that happens. What happens is, if a produce company sells an account receivable, the receivable is converted into cash, and it is removed from the trust, and the seller takes free of the trust so long as it pays commercially reasonable value. So, here we have, and let me restructure this deal just slightly for purposes of simplicity. We said in Boulder Fruit that if you sold it for 80%, that was commercially reasonable. Here, whether you call it a moment that the middleman gets 80% plus something else. So, are we going to say that's not allowed by the statute, but a deal that produced less for the growers is? No. I think it all hinges, and that's really the issue before us. Well, let's assume it's a loan for a moment. All right. If it's a loan, it's commercially unreasonable, because it can never be commercially reasonable, no matter what the terms are if it's a loan, if they're taking the trust assets ahead of the pack of trust creditors. I think there's, you may be mixing two concepts. I'm not sure it matters, but every trustee must act in a commercially reasonable fashion. That is correct. Then we have a separate problem of the lien that attaches to these accounts receivable. So, in my mind, at least, I would first look at commercially reasonable to see whether it's a good deal. Now, the second question is still what happens to this lien, but whether you do it that way or some other way. Let's assume we have two transactions, the Boulder Creek transaction and this one, and let's call this one a loan for a moment. 80% comes in, remains with the middleman who passes it on to the growers, and then he's got a chance at getting some more later. That's better than the Boulder Creek deal. Why should we find that the statute prohibits that one, a statute designed to specifically was trying to prevent was secured lenders from trumping the interest of the produce suppliers. It doesn't matter what the terms of the loan are. The bottom line is the statute says that produce guys trump the interest of secured lenders. Now, what the district court did is said, hey, if the loan is commercially reasonable, then it trumps those of the pack of creditors. In other words, the district court created a commercially reasonable exemption, wrote in an exemption into the PACA statute that says, hey, PACA trust creditors, you don't trump the PACA trust creditor, you don't trump the secured lenders if that loan is commercially reasonable. If Congress wanted to put in a commercially reasonable exemption into the statute, it would have wrote it in, but it didn't. It wanted PACA trust creditors to always trump the interest of secured lenders as it relates to PACA trust assets. Now, let me ask you the $64 question or maybe the $220,000 question. I'm not sure how much is at issue in this case. How can I tell whether this is a loan or a sale? It has lots of language in the agreement saying it's a purchase agreement. It has lots of language that seems like the language that the Fourth Circuit talks about in its case that it characterized as a loan. Is this an ambiguous contract on which parole evidence is needed? How do I determine whether it's a loan or a sale? I think you need to look at the substance of the agreement. What did the agreement do? It was an agreement whereby you have to look at the transfer of risk. Did AGRCAP assume all the risk? Did it assume the risk that the receivable would be collected? But where does the concept of transfer of risk come from? The Fourth Circuit case? It comes from the Fourth Circuit case. It also comes from the Endico case. Those are the two opinions that address the issue of transfer of risk. Now if you look at the loan documents in this case, AGRCAP never assumed any of the risk. There was a paragraph, one of the main paragraphs of the financing documents that said that Tanimura, they would force Tanimura to charge back the receivables if AGRCAP did not collect it. The term sheet as part of the financing arrangement said that Tanimura was the borrower, AGRCAP was the lender. Now I assume the 20% was to account for the chargeback. Plus the 20% holdback I assume was for the service fee, the interest rate, shall we call it that, and then some cushion for non-receivables that aren't collected. For non-payment, and I believe they would also charge back additional sums on top of the 20% in the event they didn't collect it. But that's not an issue in this case, is it? A chargeback, the 80% has already been paid out. But they could charge back even more. Theoretically, in some other case under this contract they could. Hasn't the 80% already been paid out to the growers? It's paid, but it's subject to chargeback by AGRCAP in the event they don't collect the receivable. Judge Gould has a question. Counsel, if I could interject a question. I didn't really understand your argument that AGRCAP is not subject to risk. If it pays out 80% and then it can't recover from the creditor, from the account receivable, and then it goes to charge it back again to the distributor whose accounts they bought. That distributor could be gone or broke or bankrupt. And then wouldn't they be out their 80% to the extent they can't recoup it in a bankruptcy? To the extent they can't recoup it. However, here's what AGRCAP did. They also got personal guarantees from the principals of Tanimura. They also filed UCC1 statements on all the assets of the distributor. They made another bank subordinate their interest in the assets of Tanimura so that they would have a first priority, subject, of course, to the PACA trust claims. So, no, they never assumed any of the risk. They protected themselves as much as they possibly could. If this were a true sale, AGRCAP would pay 80%, and they would bear the risk. And the borrower would be free to go on its way, and AGRCAP would be stuck with the risk of loss and the delay in collection. But that's not how it worked. Let me ask you a question about AGRCAP's fees. Its efforts produce these receivables, or at least, you know, collect the receivables. Is it your position that its fees are not collectible against the 20% retained? Nothing is collectible. They didn't do anything to collect the receivables other than put a stamp on the invoices and direct the produce buyers from Tanimura. Well, look, if it were that simple, the middleman would have collected 100% of the receivables. Obviously, the middleman thought there was some risk and that they weren't worth, you know, he couldn't get them all, and therefore, he sent them out to a factor to go collect. So your position is that even if the factor, by its efforts, produces some of these collections that might not have been produced otherwise, they can't take a fee for it. No, they can't, because the accounts receivable always remain trust assets. Subject to the claims of the Packet Trust creditors. It's always trust assets to which they prime the secured lender. Counsel, could I interject another question, just in terms of the big picture? If we adopted the rule that your client is advocating, and we said before you get to the question of whether the sale is commercially reasonable, you need to have a separate inquiry on assumption of risk, whether it's really a sale or a loan, as the Fourth Circuit said. If we did that, what would be the consequences in the factoring industry? The consequences would be, in the factoring industry, they would have to stop. They'd have to make a decision. Are we truly going to buy these receivables and make a true factoring relationship, like the court held in Boulder Fruit, the financing arrangements that's allowed, or are we still going to try to protect ourselves, pretend it's a sale, and really create a revolving line of credit? For the factoring industry, as the House report noted, when they passed the statute in 1984, this was known to the lending world. They knew they could adjust how they lend money to produce suppliers or receivers. So, Your Honor, in closing, I'd just like to say that Judge Wu, by refusing to analyze the substance of the documents in question here, created a commercially reasonable exemption to the packet, which is going to reduce it to a nullity. So what are you asking us to do? Are you asking us to remand it to the district court to analyze the documents? Yes, Your Honor. I would like it remanded to the district court with specific instructions to analyze whether this was a revolving line or was this a true sale, as it was in Boulder. Thank you. Mr. Eisenberg. Thank you, Your Honors. In Boulder Fruit, this court analyzed the exact question that it's presented with again today, and that is, very simply, if a produce beneficiary of the trust has already once received the benefits of a conversion of the receivable, can it then come back a second time and ask for the return of that receivable, in essence, expanding the trust from its original size for every dollar purchased or sold by them to TDI? They want $2 worth of protection. They want the dollar that was then, or the 98 cents in this case, that AGRICAP paid to TDI that was then used to pay them, the beneficiaries, as the statute was intended. But they also want then AGRICAP to return that dollar in receivable. Well, is that right, or do they want the two cents? As I understand their position, they've got to lean against the receivables to the extent of the amount of money that the middleman owes them, right? No. They're not asking just for the two cents. Well, I know. That's not what they're asking for. I want to understand what the law provides. Let's assume I'm the grower and I sell an apple to the middleman for $1, and the middleman sells it to the grocery store for $1.50. There's an account receivable of $1.50, right? Yes. As the grower, my lien is only $1, though, isn't it? Let's assume there's only one piece of fruit involved in this whole transaction. My lien is $1? It's not technically a lien, which is where I think it is. But your interest in the trust. My priority is $1? Yes. Okay, so tell me why they're asking for the $1.50 here. I don't understand that. Because what has happened is this is a series of transactions. So for that $1, they then have sold that TDI. TDI turns around and gets the $1.50 from the seller, or the supermarket in most cases. They take that $1.50 invoice, sell it to AgriCap. AgriCap pays them the $1.50 into an account that the TDI then uses to pay the beneficiaries of the packet trust. Let's track this apple through, because I'm still having trouble. There's no judgment. Go ahead. You can help me out here. So we have this apple, one account. It's $1.00. $1.50, account receivable. Yes. At this point, nobody's collected the account receivable. So the middleman sells the account receivable to AgriCap and receives, sells or lends, let's put that aside for a second, and receives $0.80. Or $0.80 or $1.20? Which are the two? Is it 80% of the receivable? It's actually 98% of the receivable, ultimately. That's because it's 80% of the $1.50? No, because for each receivable that AgriCap received, it paid $0.98. The dollar numbers here are the receivables. That's at the end of the day, because of collections. No, that's... But it's initially 80% of $1.50, right? Technically, you pay 100% less the fees, which in this case averaged to be 2%. So $0.98 of every receivable was paid by AgriCap. Now, let me ask the question differently. What was paid at the... Let's again, let's just take one number, the initiation of the deal. When the contract was signed, how much money was advanced to the middleman? Let's assume you had $1.50 in receivables. How much money would be advanced to the middleman at that point in time? It would be initially the 80%. Of $1.50? Of the $1.50, but with the right to then collect the extra 20 less the fees, so the extra 18 cents. And just so that I'm clear here, the total amount of receivables that AgriCap received was $20.6 million, of which they paid $20.4 million to the middleman. Right. And so, and I'm still, this may be just complete misunderstanding on my part, but bear with me on this. Once the growers have received 100 cents on the dollar of the debt from the middleman to the growers, you get to keep the rest under any scenario, correct? Once, I'm not sure I understood the court's question. Well, let me make it real simple. I'm a grower. I sold an apple to the middleman for a dollar. Once I get a dollar back, everything extra you collect with respect to that apple remains in the factor's hands, correct? Yes. Okay. So, I'm not sure I understood your position in the beginning about why they're seeking $2 on the dollar. They're seeking $1 on the dollar of the amounts owed them by the middleman, correct? Well, the monies that AgriCap paid to TDI were then used to pay off the prior invoices. I understand that at the end of the day they got 98 cents on the dollar. They're fighting about the two cents. You told me they're fighting about a dollar or two. I still don't understand why they're fighting about a dollar or two. Because not only did they receive the 20.4 million that AgriCap paid to TDI, that TDI then used to pay the beneficiaries of the trust, but they want the return of the receivables from AgriCap. So, they're asking for the disgorgement, not just of the balance, but of the entire amount that AgriCap received or acquired. I want to ask them that when they stand up, but it seems to me then that no matter what the correct legal position in the case is, the remedy that you say they're seeking may be excessive. But the argument that you're making, it seems to me, is an argument with the statute. Let's put aside the argument of whether it's a factoring agreement. Let's just say you're bank A and TDI comes and says, I want to finance my business with a loan and I'm going to give you as collateral my accounts receivable. Now, the bank loans them a million dollars. Some of it hopefully goes to the growers. Some goes for utilities and other expenses. But that million dollars of accounts receivable, assuming it's still uncollected, is subordinate to the trust, isn't it? No, it is not, Your Honors. There are concepts that have been expressed that are not in the PACA regulations and law itself. The regulations and the law are precisely what this Court in Boulder Fruit looked to, which says there shall be no any transaction that dissipates trust assets is improper. That's the standard. Your position is that the Fourth Circuit is wrong. Oh, yes. But stay with us for a second and assume that the Fourth Circuit position is right. I understood that to be that you can have a lien against trust assets, but it is subordinate to the claim of the growers up until they get paid 100 cents on the dollar. I want to ask your opponent when he stands up whether he's looking for 200 cents on the dollar, and if so, shame on him. But that's what I understood the Fourth Circuit's position to be. Is that what you understand it to be? Well, the issue that I think you've identified the issue, where the Fourth Circuit went astray is what Boulder Fruit addressed right at the outset. And that is there is clearly, in terms of what the intent of PACA is, a statement that it wants in a bankruptcy for the claims of AgriCap and others to be subordinated to the claims of the others. As to the remaining assets that remain with TDI. Different rule in your view when there's no bankruptcy? Well, apart from bankruptcy, the question is what are the assets that are being fought over? And this court in Boulder Fruit right at the outset says that is an easy question. If AgriCap as a creditor were trying to recover additional monies that were still in the name of the company, then it would be subordinated to the claims of the PACA beneficiaries. They say, however, that's not the case when you're dealing with a new question of whether an asset that has already been converted into money. And that's the language that the court says. It says where a factoring agreement allows certified, in that case that was the factoring company, to convert invoices that were not payable into cash. So they're talking generally about a transaction that has already converted money in. Sure, but what if I borrowed against them, as Judge Malloy said? I've converted them into ready cash, but I still have an obligation to pay back to the extent my loan is not paid back. And this court has said that the rule that everyone agrees applies to a sale, that is the factoring company receives the invoice free of the claims of the trust, also applies to a loan. Where did we say that? In the Hamilton and Taft decision cited on page 12, I believe it is, of our brief. No, not 12. But it's 1995. Let me tell you how I thought this worked, and obviously I think we're disagreeing here. As I understood it, if it's a loan, and so you're taking the position, as I understand, it does make a difference if you call it a loan or a factoring agreement, right? And that's what this court determined earlier. But let's assume it is a loan. As I understood it, if you still had uncollected accounts receivable in your possession as of the date of the bankruptcy, and we'll just use bankruptcy as an example, that your lien against those uncollected accounts receivable was subordinate to the PACA trust. And you say that's wrong. Correct. Because at that point, we're not dealing with a lien on an asset of the debtor. Well, now, if it's a loan, it still is an asset of the debtor. That's why you said it doesn't make any difference. Because if it's a loan, the debtor, the bank has a security interest in the asset, but it doesn't own the asset. Well, and that's, I think, exactly where the Fourth Circuit went wrong. They insisted on calling these receivables as collateral, where, in fact. But you just said it doesn't make any difference. Maybe I said it wrong. You said it doesn't make any difference if it's a loan or a sale. Correct. What is the fundamental difference that Boulder Fruit says is what is the receivable? Who owns it at that point in time? And we're dealing here with receivables that have been transferred to AGRICAP. So upon the transaction, they're stamped, and the title is transferred. So we're not dealing with collateral of the debtor. Now, I understand your position that this is a sale, and therefore it's right on with Boulder Fruit. Well, but even if it were. But you win if it's a sale. Right. Okay. Let's go back to Hamilton Taft. That's not a PACA case, is it? No, it's not. But it's a general trust principles case. Correct. Okay. I still don't understand how you say you own the receivable if it's only collateral for a loan. But under their view, it was collateral. However, it has been transferred. We're dealing here with receivables that are no longer that months ago. But that's the point. That's the whole point of the argument. You're doing what the Fourth Circuit says you can't do, which is jump over the issue of whether it's really a loan and whether you really own them. I mean, that's the gravamen of the whole Fourth Circuit argument is that you say you own them, but you don't. It's no different than if you had taken a security agreement, crossed out a security agreement, and said sale. And you did everything exactly the same thing. Well, but that is exactly the issue that Boulder Fruit addressed. It had exactly the same facts here. So you're saying you could take a security agreement, cross out the word security agreement, write in sale, and you'd be free and clear. Well, the Boulder Fruit court determined that. It had exactly the same issues with a security interest, a loan, and an argument that this was not a true sale. But it determined that it was a true sale. Correct. And so nobody's determined that in this case yet, right? The court below determined that. The court below found that it was a commercially reasonable transaction, thinking that the rule was if it's commercially reasonable, I don't care whether it's a loan or a sale. Isn't that a fair characterization of what the district court did? Well, what it looked at was what Boulder Fruit had looked at. Right, it looked at the words commercially reasonable. Well, apart from the standard, it then applied them to the particular factory agreement and said, if Boulder Fruit determined that these items, the security interest, the recourse provision, and all of those did not change this from a sale into a loan, then the court is also bound by that, which I submit is also part of the stare decisis. The items that the appellants here point to as invalidating this or changing it from a sale into a loan are precisely and only the items that Boulder Fruit looked at as well, and they said that this was a sale. Is there one different thing here? And I asked your opponent about it. I'm not sure it comes into play in this case. But you not only have a reserve of 20 percent, if you will, here to make claims against, but if the collections fall below the 80 percent, doesn't the factor have the ability to go after the 80 percent? No. No? No. This is done on an invoice-by-invoice basis. So if there's a particular invoice on which there was a, like any seller, either a misrepresentation or something that would allow Agricap to go back and say, you sold us something that isn't what it is, then it can go back on that invoice. It does not have the ability to go back on other invoices. But let me understand that. Let's assume for a second there's, again, it's my apple, and you get the account receivable for the apple, and you go to the grocery store, and Ralph says, we're having tough times, we'll pay you 70 cents for that apple. What happens then? Do you have a right to go back and make a claim against the 80 cents you paid to the middleman, or is the middleman free to keep that 80 cents? No, there's no right to go back in that situation. So you can sell, in effect, you can sell back accounts receivable, if you will, or push back accounts receivable. Can you reduce the price that you paid for them? No. The only instances are those representations that are in the agreement. Namely, if a bushel of apples has been sold and 98 of those apples were actually delivered, the invoice reflects that it was 100 apples that were done. So you reduce because you bought something. Correct. You now agree with the other side that you've bought less than what you thought you bought. But with those kinds of exceptions aside, once that 80 percent is in the hands of the middleman, you have no further ability to go get it. Correct. Okay. That's helpful. Judge Gould, did you have more? No questions, thanks. Thank you. You have a couple minutes, I believe. And maybe it would be helpful at the outset if you could tell me whether you're looking for $0.02 or $1.02. Your Honor, I'm looking to be paid for my apple, and that's it. One time. $0.02? $0.02. Whatever I sold the apple to Tanimura for is what my clients want to be paid for. And the reason my clients haven't been paid for their fruit is because Tanimura collected the Packet Trust assets that should have been paid to the Packet Trust creditors. Well, that's the question in this case. It's not the reason, it's the question. Well, I don't think that's right. I thought the lien that you have, if we want to call it a lien, the trust assets, extended only to the unpaid accounts receivable. No, Your Honor. Well, let's assume there was never a factoring agreement at all, and the middleman or middle company collected the accounts receivable themselves and converted it into cash and then paid other creditors or dissipated the money in some way. You would have no nothing, would you? Well, Your Honor, if the middleman converted it into cash and went out and bought another asset, for example, a warehouse, okay, which was the issue. What if they just paid their utility bills? They just paid their utility bills, then no. I would have to liquidate all the assets of the company, then I'd have to go after the individuals who would be liable for breach of the trust. Let me change my hypothetical to two apples for a moment. Okay. Both the same prices, dollar to the middleman, dollar-fifty to the store. On one of them, they collect a dollar-fifty. On the other one, they collect 98 cents for a total collection of $2.48. How much is owed you? $1. Whatever I sold it to the middleman. Or $2 because it's two apples. It's $2. I'm owed $2. And the reason is, it doesn't matter. Now, my question is, won't that require, if your position is correct, with respect to their collections, some sort of accounting? Because it may well be that they've collected a dollar-fifty on lots of stuff and they're entitled to keep the 50 cents. You're arguing that it has to be an aggregate, aren't you? Well, Your Honor, PACA specifically is a non-segregated floating trust. I don't have to, as a PACA trust creditor, go out and identify which account receivable was generated. My claim is up to the amount I sold it for in all the receivables of the middleman, per se. Okay? So, no, there is no accounting. I am owed a dollar. My rights into those accounts receivable and all the assets of the middleman are up to that amount. And it's a non-segregated floating trust so that the suppliers don't have to go and chase their specific dollar from their specific account. Is this case different than Boulder Fruit? This case is different. Your opponent says, really, it's the same transaction. It's not the same transaction. In this case, what we have is a disguised security interest. I know that's your conclusion, but compare the documents and tell me what the difference is. The difference is, in Boulder Fruit, all you talked about was a sale, a complete sale. I know it's what they talked about, but when I go back and look at Boulder Fruit, it's not just a document that says, we hereby sell you accounts receivable and you pay us 80 cents. No, it's not. Right. All these bells and whistles that people in the industry stick onto it. So tell me why, in what factual respect, this transaction is different than the transaction in Boulder Fruit. In this transaction, I believe that all of the – there was no transfer of risk to AgriCap whatsoever. Rather, in TransFact, it looks like TransFact took all the risk. It bought the receivables for some certain – How is the document – again, let me ask you, because I went back and tried to find the documents in each of these cases, including the Fourth Circuit case. How is the documentation of the transaction different than in Boulder Fruit? The documentation is different because, in this case, you've got AgriCap reserving its rights, transferring the risk to Tanimura. In this case, you've got a paragraph that says they could charge back. And by the way, it's not they lose the 80 percent. They can go back and go back for whatever they don't collect. They'll charge back to Tanimura. So that's one difference between the two. That's one difference. What's another difference? There's a reserve in this case, a 20 percent reserve. There was no reserve in Boulder Fruit that I can tell. Well, they sold it for 80 percent. They didn't need to reserve it. They did. But they didn't reserve 20 percent in another account just in case they didn't collect the 80 percent. But that's better for your clients than Boulder Fruit, where they took the 80 percent and marched off into the sunset. No. In this case, what happened was they took collateral, which was Packer Trust assets, and collected it at a time that somebody else's assets, my client's assets, AgriCap collected it. I understand your legal position. What gives me a bit of trouble is that your clients have gotten far more than 80 cents on the dollar. We have not. We haven't been paid but 10 cents on the dollar. Huh? We've only been paid 10 cents on the dollar in this case, even if that. Didn't they collect? No. AgriCap got all the money. Even when the Tanimura went bankrupt, AgriCap continued to collect receivables and collected another $1.9 million. So my clients. Again, both of you guys are playing with jury arguments, and I really want to hear a fact argument here. When the 80 percent was paid into Tanimura, who did it go to? I don't know. But that's not a claim you have against AgriCap, is it? I have a claim against AgriCap for all the Packet Trust assets that they received because when they received it, their interest when they received it was subordinate to the Packet Trust. When they paid 80 cents on the dollar, as I understand they did, to the middleman, wasn't their obligation with respect to that 80 cents discharged? No. If it was a sale, it would be. Now I understand. You really are looking for $2 on the dollar. No, I'm looking for payment for my fruit. That's all I'm looking for. So if it was a sale, correct, you're right. They paid 80 cents, title transfer to AgriCap, and they have it free and clear. No, thank you. No, thank you. But they did use a secure loan. At the very end, everything the veil has lifted from my eyes, I understand. Thank you, Your Honors, for your time. Good morning. My name is Robert P. Lewis, Jr., on behalf of the S&H. And I think your colleague has used up all your time. Well, and I just wanted to say I'm perfectly happy with his argument, and we submit on his argument. Thank you. And I don't think that needs a rebuttal. Thank you. We are in recess. All rise.
judges: Gould, Hurwitz, Melloy